UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KINSLEY CONSTRUCTION, INC., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | No. 5:15-cv-05185 |
| : | |
| THE KROGER CO., : | |
| : | |
| Defendant. : | |

## MEMORANDUM OPINION

Defendant's Motion for Summary Judgment, ECF No. 31 – Denied
Defendant's Motion for Partial Summary Judgment, ECF No. 32 – Denied
Plaintiff's Motion for Partial Summary Judgment, ECF No. 33 – Denied

**Joseph F. Leeson, Jr.**                                                                                       **September 23, 2016**
**United States District Judge**

### I.     Introduction

Plaintiff Kinsley Construction, Inc., ("Kinsley") has filed a Motion for Partial Summary Judgment on its breach of contract claim against Defendant The Kroger Co ("Kroger"). Kinsley contends that it entered into a contract with Kroger to perform work that included the construction of a retaining wall, and that the parties assumed in the contract that "ML soils" would be suitable for use as "fill" in the installation of the wall. According to Kinsley, it turned out that ML soils could not be used for large portions of the retaining wall, resulting in significant additional costs to Kinsley, for which Kroger has refused to pay. Kroger has, in turn, filed a Motion for Summary Judgment on Kinsley's breach of contract claim, as well as a Motion for Partial Summary Judgment on Kroger's counter-claim against Kinsley, concerning allegedly

1

defective paving work performed by Kinsley. For the reasons set forth below, the parties' motions are denied.

## II.     Background

### A.     Introduction

In 2013, Kinsley, a large general contractor based in York, Pennsylvania, was hired by Kroger, which owns Turkey Hill Dairy, to build a 78,000 square foot Turkey Hill "cooler warehouse" in Conestoga, Pennsylvania ("the Project"). Pl.'s Statement Undisputed Material Facts ¶ 1, ECF No. 33-3 (hereinafter "Pl.'s Facts").

### B.     The Geotechnical Report

In 2010, Kroger hired an engineering firm, ARM Group, Inc. ("ARM"), to conduct a geotechnical survey of the property where the cooler warehouse would sit. *Id.* ¶ 2. ARM was hired to perform further testing of the site in 2012 and prepared a "Geotechnical Investigation Report" dated May 30, 2012. *Id.* ¶ 3. ARM's report "presents the findings from a subsurface investigation performed at the site and includes geotechnical information and recommendations pertaining to future site development activities." Pl.'s Mot. Summ. J. Ex. D, at 1, ECF No. 33-7. In the "Background" section of the report, the report observes that "[b]ased on the existing topography of the site, it is understood that the proposed development will include substantial amounts of grading, as well as large retaining walls." *Id.* at 1.

Under a section titled "Design and Construction Recommendations/Considerations," the report provides recommendations for preparing "load-bearing subgrades (e.g., below buildings, pavements, retaining walls, etc.)." *Id.* at 8. The report states that these areas should be "backfilled with compacted structural fill or No. 2A coarse aggregate." *Id.* This section of the

report also includes a subsection titled "Structural Fill and Backfill," the first paragraph of which reads in part as follows:

> Imported or on-site materials proposed for structural fill should be approved by the geotechnical engineer prior to use. Structural fill and backfill should be free of ice, snow, roots, sod, or other organic matter, rubbish, slag, or other deleterious materials, and should consist of clean soil classifying as GW, GM, SW, SM, SC, ML, or CL under the Unified Soil Classification System (USCS). The maximum dry density, as determined by the modified Proctor compaction test (ASTM D-1557), should be at least 110 pounds per cubic foot (pcf). Existing site soils that meet these criteria should be acceptable for use as structural fill, although wet and dry soils may require moisture adjustment prior to use.

*Id.* at 9. Finally, the report includes a section titled "Limitations," which states that "[t]his report and associated details are for informational purposes only, and should not be considered part of the contract documents for future project construction." *Id.* at 13. The ARM report was made available to contractors who bid on the Project. Pl.'s Facts ¶ 8.

**C.**     **Project Specifications**

Kroger hired Greenfield Architects ("Greenfield") to prepare specifications for the Project. Pl.'s Facts ¶ 9. The specifications prepared by Greenfield include sections for "Earth Moving," "Segmental Retaining Walls," and "Alternates," all of which are dated April 30, 2013, relevant parts of which are summarized below.

**a.**     **Earth Moving Specifications**

The Earth Moving specifications include instructions for a number of tasks, such as "[p]reparing subgrades for slabs-on-grade, walks, pavements, lawns and grasses, and exterior plants" and "[e]xcavating and backfilling for buildings and structures, except deep foundations." Pl.'s Mot. Summ. J. Ex. F § 1.2(A), ECF No. 33-9. The specifications also include instructions for "Rock Removal." Under the heading "Classified Rock Removal," the specifications state that the "[b]ase bid includes classified rock and unsuitable soils removal where Owner pays for rock

3

and unsuitable soils removal as it is encountered at pre-approved unit prices from the Bid Form." *Id.* § 1.2 (B). Under the heading "Unclassified Rock Removal," the specifications state the following: "Provide an Alternate S-1 for unclassified rock and unsuitable soils removal where General Contractor assumes risk for all rock and unsuitable soils removal required for the project." *Id.*

Under the heading "Definitions," the specifications define "backfill" as "[s]oil material or controlled low-strength material used to fill an excavation," *id.* § 1.3(A), and "fill" as "[s]oil materials used to raise existing grades." *Id.* § 1.3(G).

Under a section titled "Materials," the specifications state as follows: "Provide borrow soil materials when sufficient satisfactory soil materials are not available from on-site excavations or from processing (eg., crushing screening) of soils or rock removed from on-site excavations." *Id.* § 2.1(A).[1] The Materials section also provides definitions for several terms, including "satisfactory soils," which is defined as follows: "Inactive mineral soil material meeting requirements of ASTM D 2487, Soil Classification Groups GW, GP, GM, SW, SP, SM, SC and CL, or a combination of these groups; free of rock or gravel larger than 2 inches in any dimension, debris, waste, frozen materials, vegetation, and other deleterious matter." *Id.* § 2.1(B).

The final section of the Earth Moving specifications is titled "Execution." According to this section, "satisfactory soil materials" are to be used in filling excavations (Section 3.1(C)), backfilling trenches, (Section 3.1(J)), and in the "soil fill" operation (Section 3.1(K)), the latter of which involves "[p]lac[ing] and compact[ing] fill material in layers to required elevations . . .

---

[1] The specification defines "borrow soil" as "[s]atisfactory soil imported from off-site for use as fill or backfill." *Id.* § 1.3(D).

[u]nder grass and planted areas" and "[u]nder walks and pavements," using "satisfactory soil material.

**b.      Segmental Retaining Walls Specifications**

The specifications for Segmental Retaining Walls provide instructions for "multiple depth segmental retaining walls with and without soil reinforcement." Pl.'s Mot. Summ. J., Ex. G § 1.2(A), ECF No. 33-10. Under the heading "Delegated Design," the specifications state that the contractor should "[d]esign segmental retaining walls, including comprehensive engineering analysis by a qualified professional engineer, using performance requirements and design criteria indicated." *Id.* § 1.3(C). Under the heading "Installation Materials," the specifications identity three types of fill to be used in the installation of the retaining walls: drainage fill, reinforced-soil fill, and nonreinforced-soil fill, each of which is defined by specific criteria. *Id.* at § 2.2.

**c.      Alternates Specification**

The specification titled "Alternates" defines an "alternate" as the "net amount, proposed by Bidder or Contractor for work described under alternate, to be added to or deducted from Base Bid amount, or Contract Sum amount if alternate is deferred, as made necessary by acceptance of Owner of alternate as designated in Agreement." Def.'s Answer Pl.'s Mot. Summ. J., Ex. K § 1.3(A), ECF No. 36-5. This specification lists several such alternates, including "Alternate No. S-1," titled "Unclassified Rock and Unsuitable Soils Removal," which reads as follows:

> Provide Add Alternate price for contractor to assume responsibility for removal of all rock (unclassified) and all unsuitable soils from the project site and provide suitable structural fill in accordance with Geotech reports for entire project. Contractor assumes all risk for rock and unsuitable soils for entire project.

*Id.* § 3.1(B).

**D.     Kinsley's Bid Proposal**

Kinsley prepared a bid to perform the construction work on the Project, dated May 31, 2013. Pl.'s Mot. Summ. J., Ex. A, App. A, ECF No. 33-4. Under the category of "Site Work," Kinsley's proposal included its price for the "Site Retaining Wall (fully engineered)" as $805,000. *Id.* On the "Alternates Form" included with the bid, Kinsley offered to add Alternate No. S-1 (described above) for the sum of $585,000.[2] *Id.* Alternates Form § 1.4. Kinsley's bid also included a document, dated May 31, 2013, that included thirteen "exclusions" and eleven "qualifications" with respect to its bid. *Id.* Exclusions & Qualifications form, May 31, 2013. Among the qualifications was "Qualification No. 2," which provides in part that, "[r]egarding Alternate S-1, this alternate is only for rock and unsuitable soils removal to applicable subgrade elevations. . . . In Alternate S-1 we assume type ML soils are satisfactory for fill per the geotechnical report and not the specifications. . . ." *Id.* at Qualification No. 2.[3]

**E.     Kroger and Kinsley's Contract**

Kroger and Kinsley entered into a written contract dated August 26, 2013. *Id.* The Contract identifies the "Contract Documents" as follows: "The Contractor's Bid, the Instructions to Bidders, the Contractor's Construction Progress Schedule, the General Conditions of the Contract, the Specifications and the Drawings, including any Addenda issued prior to Contract date, together with this Agreement, shall form the Contract as if hereto attached or herein repeated." *Id.* § 1. "Article 7" of the Contract provides procedures for "Changes in the Work." For changes initiated by the Contractor, Article 7 provides that "[i]f latent or unforeseen

---

[2]   In August 2013, the parties agreed to reduce this amount to $515,000. *Id.* App. D.
[3]   Kinsley subsequently revised its Exclusions and Qualifications in a letter dated June 21, 2013, adding two new paragraphs, including paragraph 12, which states that "[o]ur proposal includes retaining wall design based on a 4000 psf soil bearing capacity recommended in the geotechnical report." *Id.* Exclusions & Qualifications form, June 21, 2013.

6

conditions require modifications to the Contract, the Contractor shall propose changes by submitting a request for a change to the Architect. . . . On Architect's approval of a Proposal Request, after review with Owner, Contractor will issue a Change Order for signatures of Owner and Contractor." *Id.*

**F.     Construction of the Retaining Wall**

According to Kinsley, "[i]n October 2013, it was determined that, contrary to the Geotechnical Report, ML soils could not be used as backfill for large portions of the retaining wall."[4] Pl.'s Facts. ¶ 17. By letter dated November 7, 2013, Stan Hoover, Senior Project Manager for Kinsley, submitted a change order to Kroger's architect, stating that "the majority of the site has ML soils that cannot be used for fill behind the wall." Pl.'s Mot. Summ. J., Ex. K, ECF No. 33-15. Kinsley proposed two options for providing sufficient fill behind the retaining wall: Kinsley could import additional materials or it could crush bedrock currently present on the site. *Id.* Kinsley requested additional compensation for either option. *Id.*

By letter dated November 12, 2013, Kroger denied Kinsley's change order request, stating that "[t]he retaining walls and the backfill material are the responsibility of the contractor as outlined in the contract documents by delegated design and an 'unclassified' contract." *Id.* Ex. M, ECF No. 33-17. Kroger stated that Kinsley "is directed to continue construction on the large retaining wall #1 in accordance with the contract documents and the delegated design requirements from Bart Shippee [Kinsley's engineer] with no additional time extension or extra money granted." *Id.*

Kinsley completed construction of the large retaining wall. Pl.'s Facts ¶ 23. Kinsley submitted to Kroger a final change order request dated July 28, 2014, requesting the sum of

---

[4]     Kroger denies this assertion.

$1,128,588.10 for work that included "[p]rocessing rock for backfill for Retaining Wall #1" as a result of "[u]nsuitable soils at [t]he Retaining Wall." *Id.* Ex. P, ECF No. 33-20. Kroger denied Kinsley's final change order request by letter dated August 12, 2014, stating that "[a]ny disagreement that Kinsley has with [Kroger's] interpretation [of the dispute concerning the ML soils] can not affect the construction schedule or the completion of the project." *Id.* Ex. O, ECF No. 33-19.

G.     **Procedural History**

On September 17, 2015, Kinsley filed a complaint against Kroger, asserting counts for breach of contract, violation of the Contractor and Subcontractor Payment Act, and, in the alternative, unjust enrichment. Compl., ECF No. 1. Kinsley alleges that Kroger breached its Contract with Kinsley by, among other things, "failing and refusing to pay Kinsley the additional costs associated with crushing rock and processing the soils and crushed rock to create a suitable material for the retaining wall backfill . . . ." *Id.* ¶ 24. On April 15, 2016, Kroger filed an Amended Answer to Kinsley's Complaint that included a counterclaim against Kinsley concerning allegedly deficient paving work that Kinsley completed at the cooler warehouse site. ECF No. 23. The parties subsequently filed the motions presently under consideration.

III.    **Standard of Review – Motion for Summary Judgment**

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact"—that is, that no reasonable jury could return a verdict for the nonmoving party—and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The parties must support their respective contentions either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When the party moving for summary judgment does not bear the burden of proof at trial, that party thus has the choice to either "produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). A party choosing the latter option may not simply make a "conclusory assertion that the nonmoving party has no evidence." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Brennan, J., dissenting)). Instead, the moving party must "affirmatively show the absence of evidence in the record," which "may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence," or, "[i]f there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record." *Id.*

**IV.     Kinsley's Motion for Partial Summary Judgment is Denied.**

Kinsley moves for summary judgment on liability only, "requesting that the Court enforce the Contract and determine, as a matter of law, that Kinsley is entitled to additional compensation due to the inability to use ML soils as fill." Pl.'s Br. Supp. Mot. 6, ECF No. 33-2. According to Kinsley, the text at the center of the present dispute is Kinsley's Qualification No. 2, which reads in its entirety as follows:

> Regarding Alternate S-1, this alternate is only for rock and unsuitable soils removal to applicable subgrade elevations. If additional rock or unsuitable soils must be removed below the subgrade elevations, this will be a change order in accordance with the stated Unit Prices in our Bid Proposal. Also, Alternate S-1 does not include removal of unsuitable soils caused as a result of unforeseeable weather conditions, i.e. rain, snow, etc. In Alternate S-1, we assume type ML soils

> are satisfactory for fill per the Geotechnical Report and not the specifications. We also assume that particle size after placement and compaction of the fill is per the geotechnical report and not the specifications.

Kinsley contends that "[t]he language of Qualification No. 2 is clear and unambiguous, providing that Kinsley's Contract price was based on the assumption that ML soils could be used as fill." Pl.'s Br. Supp. Mot. 6. When "Kinsley was not able to use the ML type soils" for the retaining wall and incurred additional costs in completing the work, Kroger was required to "pay for that work," but has refused to do so. *Id.* at 17.

Kroger responds that the "only reasonable interpretation of Qualification No. 2" is that it applies only to the "soil fill" operation described in the Earth Moving specification. Def.'s Mem. Supp. Answer Pl.'s Mot. Summ. J. 13, ECF No. 36-1. Kroger contends that the Earth Moving specification contemplates that "fill" was to be used only with respect to the "soil fill" operation, which involved the placement of "compact fill materials in layers" under grass, planted areas, walks, and pavements, and which required the use of "satisfactory soil material." Kroger also contends that the "soil fill" operation is "completely *unrelated* to the construction of the Segmental Retaining Walls." *Id.* at 13.

The parties agree that Pennsylvania law applies to this dispute because the construction project giving rise to this lawsuit is located in Pennsylvania. Under Pennsylvania contract law, "[a]s a preliminary matter, courts must determine as a matter of law which category written contract terms fall into—clear or ambiguous." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995)). If the words of the contract are clear and unambiguous, or if the extrinsic evidence is conclusive, interpretation of the contract is a task to be performed by the

10

court rather than a jury. *See id.* But "[i]n circumstances where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury." *Id.*

"Pennsylvania contract law begins with the 'firmly settled' principle that "the intent of the parties to a written contract is contained in the writing itself." *Id.* (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). "When the words are clear and unambiguous," the intent of the parties must be determined from "the express language of the agreement." *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). "Accordingly, '[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'" *Id.* (quoting *Steuart*, 444 A.2d at 661). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Id.* (quoting *Krizovensky*, 624 A.2d at 642).

"On the other hand, a contract is ambiguous, and thus presents a question of interpretation for a jury, if the contract "'is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.* (quoting *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1425 (3d Cir. 1994)) "Under such circumstances, a court may look 'outside the "four corners" of [the] contract . . . [and] receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity.'" *Id.* (quoting *Duquesne Light Co.*, 66 F.3d at 614).

The Court begins by considering the words of the written agreement, in particular the following sentence in Qualification No. 2: "In Alternate S-1, we assume type ML soils are satisfactory for fill per the Geotechnical Report and not the specifications." According to the text of Qualification No. 2, Alternate S-1 is "only for rock and unsuitable soils removal to applicable subgrade elevations." Accordingly, it is a fair assumption that the statement in Qualification No. 2 that "we assume type ML soils are satisfactory for fill" means that Kinsley would not be

required to remove ML soils but rather would be permitted to place them on site as "fill."[5] This conclusion, however, does not yet answer the question of whether the parties agreed in Qualification No. 2 that ML soils would be suitable for the "fill" used in the installation of the retaining walls.

In order to answer this question, the Court turns to the closing phrase in the above-quoted sentence: "per the Geotechnical Report and not the specifications." The Geotechnical Report identifies ML soils as one among various types of soil that "should be acceptable as structural fill," insofar as they are "free of ice, snow, roots, sod, or other organic matter, rubbish, slag, or other deleterious materials."[6] As for the specifications, "fill" is defined in the Earth Moving specification as "[s]oil materials used to raise existing grades."[7] This definition, however, says nothing about the exclusion of ML soils and thus does not explain the meaning of the phrase "and not the specifications" in the sentence quoted above. ML soils are, however, excluded from the definition of "satisfactory soils" provided in Section 2.1 of the Earth Moving specifications, which lists several types of suitable soil, none of which are "ML soils," and which provides that

---

[5] The text of Alternate S-1 itself does not refer to "fill," but rather refers to "structural fill." The term "structural fill," however, appears to be ambiguous. Although the term "structural fill" features prominently in the ARM Geotechnical Report, the term does not appear in the Segmental Retaining Walls specifications and occurs only once in the Earth Moving specifications, in the following paragraph:

> Density Curve: Provide one optimum moisture maximum density curve for each type of material encountered in subgrades and fill materials under foundations, building slabs-on-grade, and pavements, and for each type of material used as structural fill, retaining wall backfill, steep slope and embankment fill, and replacement for unsuitable native materials, using the following tests . . . .

Pl.'s Mot. Summ. J. Ex. F § 1.5(C). Although this paragraph appears to draw a distinction between "structural fill" and "retaining wall backfill," the nature of this distinction is not clear.

[6] Pl.'s Mot. Summ. J. Ex. D, at 9.

[7] Pl.'s Mot. Summ. J. Ex. F § 1.3(G). As indicated above, the Earth Moving specification distinguishes between "fill" and "backfill," the latter of which is defined as "[s]oil material or controlled low-strength material used to fill an excavation." *Id.* § 1.3(A).

satisfactory soils should be "[i]nactive mineral soil material . . . free of rock or gravel larger than 2 inches in any dimension, debris, waste, frozen materials, vegetation, and other deleterious matter."[8] According to the Earth Moving specifications, these "satisfactory soils" are to be used in filling excavations (Section 3.1(C)), backfilling trenches, (Section 3.1(J)), and in the "soil fill" operation (Section 3.1(K)).

Turning now to the Segmental Retaining Walls specification, this specification identifies three types of fill to be used in the installation of the walls: "reinforced-soil fill," "nonreinforced-soil fill," and "drainage fill." Pl.'s Mot. Summ. J., Ex. G § 2.2. It is not clear whether, according to Kinsley, ML soils were determined to be unsuitable for all three types of fill (drainage, reinforced-soil, and nonreinforced-soil), or only for a subset of these. In any event, each of these three types of fill is defined by specific criteria. In particular, both "reinforced-soil fill" and "nonreinforced-soil fill" must meet the requirements for "satisfactory soils" set forth in the Earth Moving specification. In addition, however, "reinforced-soil fill" must also meet a supplemental set of more stringent requirements.[9]

---

[8] As set forth above, the term "satisfactory soils" is defined as "[i]nactive mineral soil material meeting requirements of ASTM D 2487, Soil Classification Groups GW, GP, GM, SW, SP, SM, SC and CL, or a combination of these groups; free of rock or gravel larger than 2 inches in any dimension, debris, waste, frozen materials, vegetation, and other deleterious matter." *Id.* § 2.1(B).

[9] Specifically, reinforced-soil fill must meet the following criteria:

> ASTM D 2487; GW, GP, SW, SP, and SM soil classification groups or a combination of these groups; free of debris, waste, frozen materials, vegetation, and other deleterious matter; meeting the following gradation according to ASTM C 136: 20 to 100 percent passing No. 4 sieve, 0 to 60 percent passing No. 40 sieve, 0 to 10 percent passing No. 200 sieve, and with fine fraction having a plasticity index of less than 20.

*Id.* at § 2.2(G).

As set forth above, Kinsley contends that the term "fill" in Qualification No. 2 was intended to be a generic term embracing all sub-varieties of fill used in the Project, including all types of fill used in the installation of the retaining walls. Although the text of the Contract does not rule out this interpretation, it also does not compel it. It is also plausible to interpret the term "fill" in Qualification No. 2 to refer simply to the "satisfactory soils" identified in the Earth Moving specification, but not, for example, to the more specialized "reinforced-soil fill" identified in the Segmental Retaining Walls specification. One argument in favor of this interpretation is that the definition of "satisfactory soils" in the Earth Moving specification is in many respects similar to the definition of "structural fill" provided in the Geotechnical Report.[10] Both definitions provide basic requirements for soil materials which are to be used for a variety of tasks such as filling excavations, backfilling trenches, and for placement under grasses. "Reinforced-soil fill," by contrast, is subject to more specialized requirements, as described in the Segmental Retaining Walls specification, and there is no clear indication in Qualification No. 2 that the parties believed that ML soils could fulfill these requirements. On this interpretation, then, while the parties agreed in Qualification No. 2 that ML soils could fulfill the requirements of "satisfactory soils," and thus serve as a basic general-purpose fill, they did not agree that ML soils could fulfill the more specialized requirements of the "reinforced-soil fill" to be used in the installation of the retaining walls.

---

[10] One interpretive difficulty presented by the Contract is that the various components of the Contract rarely use the same terms. Thus, whereas the Geotechnical Report often uses the term "structural fill," this term is generally absent from the specifications, which instead use terms such as "satisfactory soils," "nonreinforced-soil fill," and "reinforced-soil fill," terms which are absent from the Geotechnical Report.

14

This latter interpretation of the Contract, however, is likewise neither ruled out nor compelled by the words of the Contract.[11] In other words, the Contract is susceptible to both of the interpretations outlined above. The Contract is therefore ambiguous, such that Kinsley has not shown that the parties assumed that ML soils would be suitable for each type of fill used in the construction of the retaining wall.[12]

Finally, the ambiguity in the Contract cannot be resolved by reference to the extrinsic evidence submitted by the parties.[13] Thus, the provisions in the Contract concerning the soils are

---

[11] As indicated above, Kroger argues for an even more limited interpretation of "fill" in Qualification No. 2. According to Kroger, "fill" is unambiguously limited to the "soil fill" operation described in the Earth Moving specification, which involved the placement of "compact fill materials in layers" under grass, planted areas, walks, and pavements, and which required the use of "satisfactory soil material." Kroger also contends that the "soil fill" operation is "completely unrelated to the construction of the Segmental Retaining Walls." This is by no means clear. First, the Earth Moving specification and Segmental Retaining Walls specification are expressly related to one another: the Segmental Retaining Walls specification identifies the Earth Moving specification as a "[r]elated section" and cites that specification a number of times. Further, the "satisfactory soils" used in the soil fill operation are used not only in the "soil fill" operation, but also in filling excavations (Section 3.1(C)), backfilling trenches, (Section 3.1(J)), and, with respect to nonreinforced-soil fill, in the installation of the segmental retaining walls.

[12] Kroger contends that "under the doctrine of contra proferentem, to the extent there is any ambiguity in the Qualifications and Exclusions drafted solely by Kinsley, the interpretation proffered by Kroger must be accepted as the one which governs this dispute, provided that it is reasonable." Def.'s Mem. Supp. Answer Pl.'s Mot. Summ. J. 25. "It is well-established, however, that '[a]lthough the intent of the parties to a contract is normally a question for the court, it becomes a jury question if [the contract] is ambiguous and its resolution depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.'" *State Farm Mut. Auto. Ins. Co. v. Philly Family Practice, Inc.*, 525 F. Supp. 2d 718, 726 n.5 (E.D. Pa. 2007) (quoting *Motor Coils Mfg. Co. v. Am. Ins. Co.*, 454 A.2d 1044, 1048 (Pa. Super. Ct. 1982)). Thus, "courts have commonly employed jury instructions to suggest the use of the *contra proferentem* rule to juries." *Id.* Moreover, "automatic application" of the *contra proferentem* rule is inappropriate where the parties engaged in free and bilateral negotiations, *Galdieri v. Monsanto Co.*, 245 F. Supp. 2d 636, 647 (E.D. Pa. 2002), nor is the rule "intended as a talismanic solution to the construction of ambiguous language," *Burns Mfg. Co. v. Boehm*, 356 A.2d 763, 767 n.2 (Pa.1976).

[13] Kinsley argues that the Contract is "clear and unambiguous" and thus can be interpreted without resort to extrinsic evidence. Nevertheless, Kinsley's brief relies heavily on extrinsic evidence, in particular an email written by an employee of Kroger's architect and deposition

"ambiguous as a matter of law, and the ultimate interpretation [is] properly left for a jury to determine through consideration of all relevant evidence, including the language of the Contract[] and any relevant extrinsic evidence concerning the parties' intent." *See Phila. Workforce Dev. Corp. v. KRA Corp.*, 156 F. Supp. 3d 616, 632 (E.D. Pa. 2016).[14]

## V. Kroger's Motions for Summary Judgment and Partial Summary Judgment are Denied.

Kroger failed to include with its Motion for Summary Judgment and Motion for Partial Summary Judgment a "separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried," contrary to the requirements of the Court's scheduling order filed January 25, 2016. *See* ECF No. 9. The Court's requirement for a concise statement of undisputed material facts is consistent with Rule 56 of the Federal Rules of Civil Procedure. In addition, Rule 83(b) of the Federal Rules of Civil Procedure provides that:

---

testimony provided by a project manager for Kroger. The meaning and significance of this extrinsic evidence is disputed by Kroger.

[14] Kinsley's Motion fails for an additional reason: the nature of the alleged breach is not clear. Kinsley contends that Kroger breached the Contract when it failed to pay for work "required under the Contract." Pl.'s Br. Supp. Mot. 17. However, according to Kinsley's own interpretation of the Contract, the use of non-ML soils to build the retaining wall was not, in fact, required under the Contract. (That is, according to Kinsley's interpretation of the Contract, the Contract assumed that ML soils would be suitable for the retaining wall.) For this reason, Kinsley appears to be asserting an unjust enrichment claim rather than a breach of contract claim. *See Massiah v. Hood*, 10 A.2d 79, 82 (Pa. Super. Ct. 1939) (holding that a sub-contractor was entitled to recover on a claim for "implied assumpsit" when he performed additional work at the insistence of a contractor who had erroneously contended that the sub-contractor was required to perform the work under the parties' contract). The *Massiah* court observed that "[h]ad [the sub-contractor], because of interpretation of the plans and specifications by [the contractor] that the [works] were embraced in the contract, refused to proceed with the work, he would have laid himself open to an action of damages for breach of contract if [the contractor's] interpretations were sustained." *Id.* The court held that the contractor "cannot avoid liability for the payment of this extra work where they compelled [the sub-contractor] to perform the same under the theory that it was part of the original contract." *Id.*; Restatement (Third) of Restitution and Unjust Enrichment § 35 (Am. Law Inst. 2011).

16

> A judge may regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules. No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement.

Here, Kroger had notice of the Court's requirements by virtue of the scheduling order. "Requiring strict compliance with [this order] is justified . . . by the nature of summary judgment." *See Gardels v. Cent. Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980) (discussing the requirement of strict compliance with a D.C. District Court local rule that parties file "[w]ith each motion for summary judgment . . . a statement of the material facts as to which the moving party contends there is no genuine issue").

> The moving party's statement [of undisputed facts] specifies the material facts and directs the district judge and the opponent of summary judgment to the parts of the record [that] the movant believes support his statement. The opponent then has the opportunity to respond by filing [a statement of disputed facts] and affidavits showing genuine factual issues. The procedure contemplated by the [order] thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.

*See id.* Kroger's omission of the required statement of undisputed facts prevented this process from unfolding as contemplated by the Court's scheduling order. Kroger's motions are therefore denied.

## VI. Conclusion

For the reasons set forth above, the parties' motions for summary judgment, ECF Nos. 31-33, are denied. A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

17